UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| MICHELE D. HOBBS, JAMIE L. JACKSON, AND GWEN RHOMES,<br><br>Plaintiffs,<br><br>v.<br><br>KING COUNTY,<br><br>Defendant. | CASE NO. C14-1156RSM<br><br>ORDER GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION |

## I.    INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. #91. Defendant argues that all three Plaintiffs' claims should be dismissed in their entirety because they include allegations outside the applicable statute of limitations, Plaintiffs' fail to make *prima facie* claims for discrimination, retaliation and hostile work environment, and Plaintiffs' fail to address several of their pending claims at all. *Id.* and Dkt. #130. Plaintiffs ask the Court to deny summary judgment on the basis that there are numerous questions of material fact. Dkt. #127. None of the parties have asked for oral argument on this motion, and the Court finds oral argument unnecessary. Having reviewed the parties' briefing, and for the reasons discussed below, the Court now GRANTS Defendant's motion and dismisses this case.

## II.    BACKGROUND

This is an employment matter involving allegations of race discrimination, retaliation and hostile work environment.  Plaintiffs are current or former employees of the King County Department of Information Technology ("KCIT"), and are all African-American.  Dkt. #1, Ex. A at ¶ ¶ 3.1-3.5.  Former Defendant William Kehoe was appointed as Director of KCIT in August of 2010.  Dkt. #101 at ¶ 3.  While the claims are brought in common by Plaintiffs, their employment situations are factually different.  Accordingly, the Court sets forth the facts with respect to each Plaintiff separately herein.

### A.  Jamie Jackson

Plaintiff Jamie Jackson has worked as a KCIT customer service representative since 2001 and remains employed by King County.  Dkt. #99, Ex. 1 at 18:12-20:1.  Ms. Jackson alleges that she has experienced racial animus in the workplace on a regular basis.  Dkt. #127 at 5.  Ms. Jackson asserts that she heard her former supervisor and interim KCIT CIO, Roger Kirouac, refer to her and her coworkers as "you guys" and she felt that demonstrated racial animus.  Dkt. #123, Ex. 2 at 44:22-24 and 45:19-23.  Ms. Jackson also states that Mr. Kirouac refused to greet her or even shake her hand, which she also believes is because she is African American.  *Id.* at 38:8-39:2.

In 2010, Ms. Jackson complained that Mr. Kirouac touched her inappropriately and referred to Ms. Jackson's work group as "you guys."  Dkt. #109 at ¶ 8 and Ex. 3 thereto.  Ms. Jackson also reported that her workgroup was anonymously referred to as "minority row," although she herself had not heard the comment directly.[1]  *Id.* at Ex. 3.  As a result, King

---

[1]  Ms. Jackson testified at her deposition that much later she found out the phrase actually used was "nigger row."  Dkt. #123, Ex. 2 at 57:14-22.  She stated that the person who told her about the comment (co-Plaintiff Gwen Rhomes) could not bring herself to say the word "nigger" and replaced it with "minority."  *Id.* at 57: 23-58:7.

County Human Resources Director Anita Whitfield (who is also African American) hired outside investigator Claire Cordon to investigate Ms. Jackson's claims.  Dkt. #109 at ¶ ¶ 6 and 7 and Ex. 2 thereto.  Ms. Cordon interviewed all three Plaintiffs, along with numerous other employees, as part of her investigation.  Dkts. #98 at ¶ 2 and #109 at ¶ 7 and Ex. 2.  Ms. Cordon ultimately concluded that neither King County nor Mr. Kirouac had discriminated against or harassed Ms. Jackson or any other King County employee identified by Ms. Jackson on the basis of race or sex.  Dkt. #109, Ex. 2 at 2.  Ms. Cordon also concluded that neither King County nor Mr. Kirouac created or tolerated a hostile work environment for Ms. Jackson or any other employee identified by Ms. Jackson based on sex, race or any other protected job category.  Dkt. #109, Ex. 2 at 2.

Ms. Jackson alleges that the investigation was flawed in two respects.  First, she believes that Ms. Cordon improperly investigated whether Mr. Kirouac sexually harassed Ms. Jackson, even though her complaint "had nothing to do with sexual harassment."  Dkt. #127 at 6.  Second, Ms. Cordon investigated whether anyone in the office used the phrase "minority row" to refer to Ms. Jackson's and co-plaintiff Ms. Rhomes' workgroup, when the phrase that was actually used was "nigger row."  *Id.*  Ms. Jackson acknowledges that at the time of Ms. Cordon's investigation, Ms. Jackson thought the phrase used was "minority row," and therefore it was not surprising that Ms. Cordon's investigation concluded Ms. Jackson's complaints were unfounded.  Dkt. #127 at 6.

Shortly thereafter, Mr. Kehoe was appointed to be director of KCIT.  According to Mr. Kehoe, one of his first tasks was to manage Mr. Kirouac's dissatisfaction with the circumstances surrounding Ms. Cordon's investigation.  Dkt. #101 at ¶ 5.  Ms. Whitfield had informed Mr. Kehoe that she had heard Mr. Kirouac was upset and he blamed his subordinates

ORDER
PAGE - 3

for the investigation.  *Id.* at ¶ ¶ 5 and 6.   Accordingly, Mr. Kehoe told Mr. Kirouac to stop complaining about his subordinates and, when he did not stop, demanded that Mr. Kirouac resign in lieu of termination.   *Id.* at ¶ 6.   Mr. Kirouac effectively left KCIT beginning on August 31, 2010, when he was placed on administrative leave.  Dkt. #109 at ¶ 9.   Mr. Kirouac subsequently resigned without returning to work.

When Mr. Kehoe became Director, he was also tasked with centralizing all KCIT services and its multiple help desks.  Dkt. #93 at ¶ 4.   The help desks were consolidated into the KCIT Service Center in September 2011.  *Id.* at ¶ 4 and Ex. 1 thereto.   As part of the IT consolidation, KCIT hired a Customer Service Lead and a Technical Support Lead.  *Id.* at ¶ ¶ 4 and 5.   The recruitment was run by Krista Bautista, who had been hired to lead the Service Center, and Melanie Hanisco, a Senior Human Resources Analyst and lead recruiter for KCIT.  *Id.* The hiring process consisted of an initial "paper" review of resumes, cover letters and a supplemental applicant questionnaire.   The higher scoring candidates were then interviewed and rated in a two-step interview process.  *Id.*

Ms. Jackson applied for the Customer Service Lead position.   She became a finalist for the position and interviewed.   However, Laura McCollum-Wallace (who is Hispanic/Latina) was the highest scoring applicant after the interviews, and she was offered and accepted the position.   Dkt. #93 at ¶ ¶ 4-7.   After Ms. McCollum-Wallace was selected, Ms. Jackson believed in part that she was not selected because an employee named John Heath was on her first interview panel.  Dkts. #99, Ex. 1 at 24:17-25:7 and #100 at ¶ 4.  Ms. Jackson believed that Mr. Heath had scored her low in the interview process in retaliation for her complaint about Mr. Kirouac.  Dkts. #99, Ex. 1 at 24:17-25:7 and #100 at ¶ 4.  To the contrary, Mr. Heath had scored Ms. Jackson on the high end.  Dkt. #99, Ex. 1 at 88:4-6.   In fact, Mr. Heath scored Ms.

ORDER
PAGE - 4

Jackson high enough so that she tied for first place.  Dkt. #100 at ¶ 6.  Ms. Jackson asked to see the interview scores for all of the candidates involved in the hiring process.  Dkt. #109 at ¶ ¶ 10-11.  Initially, Ms. Jackson was not provided with the rating/scoring forms on the basis of employer confidentiality.  *Id.* at ¶ 11.  However, Ms. Hanisco and Human Resources Delivery Manager II Christine Ynzunza met with Ms. Jackson and gave her a verbal overview of how she had performed in relation to the other candidates.  *Id.*  They also told Ms. Jackson that Mr. Heath had co-ranked her with the highest score.  *Id.*  Later, Ms. Jackson obtained copies of the interview rating/scoring forms after her labor union obtained them from King County.  Dkt. #94 at ¶ 4.

In May of 2012, Ms. Jackson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she was denied the lead position because of her race and in retaliation for the complaint she made against Mr. Kirouac in 2010.  Dkt. #109 at ¶ ¶ 14-15 and Exs. 5-6 thereto.  Ms. Ynzunza prepared King County's response, including the raters' scores of the candidates.  *Id.*  The EEOC issued a Dismissal and Notice of Rights on October 18, 2012, concluding that it was unable to determine that any statutory violation had occurred.  Dkt. #109 at ¶ 16 and Ex. 7.

In July of 2013, Ms. Jackson contacted Director of the Human Services Division of the King County Department of Executive Services Nancy Buonanno-Grennan and Mr. Kehoe and complained about perceived mistreatment by Ms. Ynzunza.  Dkt. #94 at ¶ 3.  Ms. Jackson believed it was unethical for Ms. Ynzunza to have prepared the response to the EEOC complaint because one of the allegations was about Ms. Ynzunza directly.  Ms. Jackson also continued to complain about Ms. Ynzunza's refusal to provide the scores from the lead interview process.  Dkt. #94 at ¶ 3 and Ex. 1 thereto.  Thus, Ms. Jackson asked to be reassigned

ORDER
PAGE - 5

to a new customer service representative.   Dkt. #94 at ¶ 3 and Ex. 1.   As a result of the complaint, Mr. Kehoe assigned HR representative Silvette Lee to be Ms. Jackson's point of contact for HR issues.   *Id.* at ¶ 5 and Ex. 2.   In addition, Ms. Buonanno-Grennan assigned Senior HR Policy Advisor Richard Hayes to investigate the complaints.   *Id.* at ¶¶ 5-6 and Ex. 3 thereto.   Mr. Hayes found no evidence to support Ms. Jackson's claims.   *Id.* at ¶ 6 and Ex. 3.

Although not entirely clear, it also appears that Ms. Jackson alleges she was denied leave in retaliation for her various complaints.   *See* Dkt. #99, Ex. 1 at 133:21-135:25 and 140:13-150:8.   The record demonstrates that since January 1, 2012, Ms. Jackson has been granted 3,297.75 hours of paid and unpaid leave both for her own health care needs and the needs of her son.   Dkt. #95 at ¶ 6 and Ex. 1 thereto.

**B.  Michele Hobbs**

Plaintiff Michele Hobbs began working for King County in 1994.   Dkt. #1, Ex. A at ¶ 3.3.   She remained employed until 2013.   *Id.*   At the time her employment was terminated, she held the position of Fiscal Specialist II.   *Id.*   A Fiscal Specialist is responsible for paying vendor bills and invoices, charging or billing individual King County departments or projects for the cost of vendor services or products, paying phone and pager bills, and managing budgets.   Dkts. #96 at ¶ 3 and #104 at ¶¶ 4-5.

According to King County, Ms. Hobbs had trouble performing her fiscal duties for many years.   Apparently, in 2004, her former supervisor Helen Harris (who is also African American) assigned Ms. Hobbs to staff a reception desk as a result of her displeasure with Ms. Hobbs' work.   In 2007, after Ms. Harris retired, Christine Chou, who is currently the head of KCIT's business and finance section, became Ms. Hobbs' supervisor.   Dkt. #96 at ¶ 5.   In 2007/2008, Ms. Hobbs informed Ms. Chou that she had not received any merit-based pay

increases for several years.  *Id.* at ¶ 6.  Ms. Chou could not give such a pay increase unless performance scores were at a certain level, and Ms. Hobbs' scores were not at that level.  *Id.* However, Ms. Chou increased Ms. Hobbs' scores to the requisite level in order to give her a pay increase which would be effective in January of 2009.  *Id.*  Ms. Hobbs has no complaints about the way Ms. Chou treated her.  Dkt. #107, Ex. H at 56:15-17.

In late 2008, Paul Mudrovich became Ms. Hobbs' direct supervisor.  Dkt. #104 at ¶ 4. Ms. Hobbs told him that she wanted to perform more of her work as a fiscal specialist and not as a receptionist.  *Id.* at ¶ 6.  Around that time, another fiscal section employee was temporarily out of the office on maternity leave.  *Id.* at ¶ 7.  Mr. Mudrovich temporarily reassigned Ms. Hobbs to that employee's position, which gave her an opportunity to perform different and higher level work at a higher classification level (Fiscal Specialist III) and higher salary.  *Id.* Ms. Hobbs worked in that position for approximately three months.  At the end of that time, Mr. Mudrovich found her work unsatisfactory and he returned her to her reception desk duties. *Id.*

The reception desk was closed in 2011 as part of general cost savings efforts.  *Id.* at ¶ 9 and Ex. A thereto.  Mr. Kehoe directed Mr. Mudrovich to begin assigning fiscal specialist work to Ms. Hobbs.  *Id.*  According to Ms. Hobbs, Mr. Mudrovich resisted moving Ms. Hobbs into her Fiscal Specialist II position.  Dkt. #127 at 1.  Mr. Mudrovich gradually assigned Ms. Hobbs more fiscal specialist work.  *Id.* at ¶ 10.  He assigned her "to easier vendor accounts."  *Id.* These were accounts that were regularly recurring month after month.  *Id.*  For example, he assigned Ms. Hobbs to pay invoices for the monthly "Frontier" or "Comcast" accounts.  Dkt. #104 at ¶ 10.  Mr. Mudrovich considered Ms. Hobbs' performance to be satisfactory even though she made mistakes.  *Id.*

ORDER
PAGE - 7

In 2012, KCIT implemented a new accounting software system called "Oracle," also referred to as "ABT." *Id.* and Dkt. #107, Ex. H at 42:4-14. During the same time period, KCIT reorganized its operations. Dkt. #107, Ex. H at 46:4-5. KCIT grew from approximately 180 employees to 450 employees, however there was no increase in the number of staff in Ms. Hobbs' group to accommodate the increased workload. *Id.* at 46:9-47:2. The reorganization changed Ms. Hobbs' workload significantly. Dkt. #104 at ¶ 12. Mr. Mudrovich felt that the changes put a lot of stress on everybody, and with the increased workload he could no longer correct Ms. Hobbs' mistakes. *Id.* He asserts that she continued to struggle month after month, even with her "easier" accounts. *Id.* According to Ms. Hobbs, Mr. Mudrovich denigrated Ms. Hobbs' work in retaliation for "being forced to move her to a fiscal position." Dkt. #127 at 1.

Mr. Mudrovich completed Ms. Hobbs' 2011-2012 annual performance appraisal in September 2012. Dkt. #104 at ¶ 13 and Ex. B thereto. The appraisal covered the period from September 1, 2011, through August 31, 2012. It was primarily based on her front desk receptionist responsibilities. *Id.* However, Mr. Mudrovich noted in the appraisal that Ms. Hobbs' work was significantly changing. He then downgraded her 2011-2012 score because he felt that Ms. Hobbs was already having trouble properly performing her fiscal duties. *Id.* Overall, he rated her performance as "satisfactory." Apparently, Mr. Mudrovich's supervisor, George Vida, felt that Ms. Hobbs' mistakes were unacceptable. Accordingly, in October 2012, at the direction of Mr. Vida, Mr. Mudrovich placed Ms. Hobbs on an "employee improvement/success plan." *Id.* at ¶ 14 and Dkt. #107, Ex. H at 164:17-22.

According to Ms. Hobbs, Mr. Mudrovich treated Ms. Hobbs differently than her coworkers, "all of whom were Caucasian." Dkt. #127 at 2. She asserts that Mr. Mudrovich refused to give her clear instructions about how she was to perform her job, or allow her to

attend staff meetings.  Dkt. #114 at ¶ 4.  She believes he was overly critical of her work.  Dkt. #127 at 2.  She states that once she followed his instructions, he would "come up with a new way he wanted her to do the task."  *Id.*  Ms. Hobbs felt like she could not do anything right in Mr. Mudrovich's eyes. *Id.*

Ms. Hobbs also asserts that Mr. Mudrovich's attitude towards her "trickled down" into the workgroup, causing Ms. Hobbs to feel alienated from her coworkers.  Dkt. #127 at 3.  She said she would regularly overhear her coworkers talking about her behind her back, she was not welcome to have lunch with them, and she was never invited to their workplace-related social events.  Dkt. #123, Ex. 1 at 83:10-13 and 101:2-12.  Ms. Hobbs also alleges that her coworkers received reclassifications of their positions and titles while Ms. Hobbs did not.[2]  Dkt. #127 at 3.

While the improvement plan was in place, Mr. Mudrovich documented numerous mistakes made by Ms. Hobbs.  Dkt. #104 at ¶ ¶ 22-33 and exhibits thereto.  At the end of the improvement plan, Mr. Mudrovich concluded that Ms. Hobbs could not perform adequately as a fiscal specialist and recommended her termination.  Dkt. #104 at ¶ 34 and Exs. C and G thereto.  Ms. Hobbs was discharged from employment by Mr. Kehoe.  *Id.*  During Ms. Hobbs' *Loudermill* hearing, Ms. Hobbs and her attorney informed Mr. Kehoe that she believed she was being discharged because of her race and that "false allegations" were made about her mistakes.  Dkts. #101 at ¶ 14 and #107, Ex. H at 135:5-136:18.  However, she did not appeal her discharge.  Dkt. #107, Ex. H at 135:5-137:2.

///

///

---

[2]   In her response brief, Ms. Hobbs states that she was told that her African American coworkers who all sat in a row in a workgroup separate from her own were referred to as "nigger row."  However, her citation to the record does not support that statement.  *See* Dkt. #114 at ¶ 4.  In fact, nowhere in Ms. Hobbs' declaration does she make such a statement.  *See* Dkt. #114.  The Court also notes that Ms. Hobbs' declaration is not dated.  Dkt. #114 at 2.

### C.  Gwen Rhomes

Plaintiff Gwen Rhomes worked as a service representative for Qwest/Century Link for thirty-four years.  Dkt. #107, Ex. F at 8:19-25.  In 2006, after her retirement from Century Link, Ms. Rhomes was hired by KCIT for successive temporary positions called "term limited" ("TLT") positions.  *Id.* at 10:13-16, 10:19-11:1 and 11:18-12:15 and Dkt. #109 at ¶ ¶ 20-22. Due to past litigation about the usage and failure to pay benefits to temporary workers, King County regulates and limits the duration of employment for term limited employees.  Dkt. #109 at ¶¶ 20-21.

Ms. Rhomes asserts that throughout her employment she had to endure the pervasive racial tensions that existed in the workplace.  Dkt. #127 at 8.  For example, when Ms. Rhomes put up a poster in the office celebrating Black History Month, it was so unwelcome that she took it down within hours of putting it up.  Dkt. #116 at ¶ 4.  Ms. Rhomes also states that her workgroup was comprised of mostly African Americans and she heard it was referred to as "you guys" or "those people."  Dkt. #123, Ex. 5 at 33:10-20, 34: 4-10 and 34: 18-21.   She further states that when a Caucasian employee, Sonja Baren, was eventually transferred to the group, Ms. Baren said to Ms. Rhomes that the workgroup was now going to be "the blacks and the Jews" (since she was Jewish).  *Id.* at 29:5-19.

Ms. Rhomes alleges that Mr. Kirouac was particularly offensive.  Dkt. #127 at 8.  She asserts that he regularly made denigrating comments towards the African American employees, often in front of the whole department.  *Id.*  She states that on one occasion he said that Ms. Rhomes and her African American coworkers did "monkey work" and referred to them as "monkeys."  Dkt. #123, Ex. 5 at 31: 4-10 and 38: 5-16.  She has also stated that he would often criticize how much Ms. Rhomes and her African American coworkers were being paid,

ORDER
PAGE - 10

implying that he thought they were paid too much.  Dkt. #116 at ¶ 4.  However, she did not complain about Mr. Kirouac in order to keep her job.  *Id.*

In Ms. Rhomes' workgroup, there was a row of African American employees who all sat next to one another.  Ms. Rhomes alleges that in early 2010 she was informed by a colleague that the other side of the building was referring to her workgroup as "nigger row." Dkt. #123, Ex. 5 at 26:8-25, 28:6-17 and 29:5-12.  Ms. Rhomes did not want to use the word "nigger," so when referring to the comment she replaced it with "minority.  *Id.* at 26:10-12. Ms. Rhomes expressed concern that she and her African American colleagues were being referred to as "niggers" in the workplace to her supervisors, Barbara Ivery and Daryl Hunt.  *Id.* at 29:25-30:2 and 30:10-12.   Ms. Rhomes asserts that nothing was ever done about her complaints.  Ms. Rhomes further states that she then brought her concerns regarding racial hostility in the workplace to Mr. Kehoe, but he also never did anything about it.  *Id.* at 50:14-18 and 51:15-17 and Ex. 3 at 59:21-24.

Ms. Rhomes alleges that after she complained about racial hostility she was unable to get assigned to new projects under her TLT contract.  Dkt. #127 at 10.  She also alleges that the timing of her TLT position was not accurately calculated by human resources, and therefore she was unable to be considered for new projects since her file reflected that her time was expiring at a time that was earlier than it should have been, making her ineligible for consideration for new projects.  Dkt. #116 at ¶ 6.  She alleges that she worked for more than a year to get this error corrected.

In January 2010, Ms. Rhomes was informed that she would be rehired for her final assignment, and that her employment would end on June 30, 2010.  *Id.* at ¶ 22 and Exs. 8, 9 and 10 thereto and #107, Ex. F at 61:13-23.  Ms. Rhomes' position ended as stated.  Ms. Rhomes

was informed that she would not be hired into another position or extended to a final term limited position because of budget concerns.  Dkt. #107, Ex. F at 145:7-14.

Term limited employees may become career service employees if their term limited employment exceeds the permissible limit in the King County Code.  Dkt. #109 at ¶ 20.  If a term limited employee exceeds the three year limit, he or she may appeal to become career service permanent employee.  Dkt. #109 at ¶ 20.  After her term limited position ended, Ms. Rhomes appealed to Ms. Whitfield to be retained as a permanent career service employee because she exceeded the maximum term.  *Id.* at ¶ 25 and Ex. 12 thereto and Dkt. #107, Ex. F at 62:19-21.  Ms. Whitfield denied the appeal.  Ms. Rhomes then asked Mr. Kehoe to overturn Ms. Whitfield's decision, but he declined because he did not believe he had the authority to do so.  Dkt. #101 at ¶ 21.

Nicole Maley is Mr. Kehoe's confidential secretary.  Dkt. #101 at ¶ 23.  According to Ms. Maley, in early June 2011, Ms. Rhomes telephoned Ms. Maley and began complaining about the end of her term limited position.  Dkt. #107, Ex. E at 36:18-37:1.  Ms. Maley stated that all she could do was refer Ms. Rhomes to HR, but Ms. Rhomes grew angry and Ms. Maley ended the call.  *Id.* at 37:2-38:6.  Ms. Rhomes denies that she ever yelled at Ms. Maley.  Dkt. #127 at 11.  Ms. Maley then contacted Ms. Hanisco in HR regarding the call.  *Id.* at 40:7-24.  Subsequently, Ms. Maley received a second phone call from Ms. Rhomes, which she characterizes as offensive.  *Id.*  at 38:7, 40:7-24, 44:1-20 and 46:18-47:7.  Ms. Rhomes apparently called to continue to complain about the end of her employment.

Ms. Rhomes also called Ms. Hanisco to complain about the end of her employment.  Dkt. #107, Ex. A at 43:16-47:10.  According to Ms. Hanisco, Ms. Hanisco attempted to gather information to assist Ms. Rhomes, but Ms. Rhomes was so angry that it was difficult.  *Id.*

ORDER
PAGE - 12

About two weeks later, Ms. Hanisco and Ms. Rhomes spoke again on the phone.  According to Ms. Hanisco, Ms. Rhomes angrily attacked Ms. Hanisco and accused Ms. Hanisco of failing to assist her.  Dkt. #107, Ex. A at 53:16-54:12.  Ms. Rhomes admits that she spoke "passionately" to Ms. Hanisco, but denies that she was ever upset with her.  Dkt. #127 at 11.

Ms. Maley discussed her interaction with Ms. Rhomes with Mr. Kehoe.  Dkt. #107, Ex. C at 104:11-105:24.  Mr. Kehoe also learned of the phone call with Ms. Hanisco.  Mr. Kehoe then went to Ms. Ynzunza and told her that Ms. Rhomes' behavior was not acceptable and he did not want her to work for KCIT.  Dkts. #107, Ex. D at 114:4-115:5 and #109 at ¶ 27.

In March 2013, Ms. Rhomes' former supervisor, Mark Van Horn, asked Ms. Rhomes if she would come to work for him for a short term assignment.  As soon as Ms. Ynzunza learned that Mr. Van Horn had offered a temporary position to Ms. Rhomes, she informed Mr. Kehoe.  *See* Dkt. #101 at ¶ 25.  Upon receiving the information, Mr. Kehoe told Ms. Ynzunza that he would not authorize the hiring of Ms. Rhomes because of her previous interactions with Ms. Maley and Ms. Hanisco.  *Id.*  He directed that the offer made to Ms. Rhomes be rescinded.  Ms. Ynzunza told Mr. Van Horn and his supervisor, Bob Micielli, that Mr. Kehoe would not rehire Ms. Rhomes, and Mr. Van Horn was instructed to communicate the rescission to Ms. Rhomes.  Dkt. #109 at ¶ 31.

Ms. Rhomes complained about the rescission of her job offer to the King County Ombudsman.  Dkt. #92 at ¶¶ 3-4.  Ms. Rhomes' complaint was assigned to investigator Lynn Anders.  *Id.* at ¶ 4.  Ms. Anders concluded that it was more likely than not that Ms. Rhomes had exhibited offensive or aggressive behavior when talking with Ms. Maley and Ms. Hanisco, and therefore those interactions were a reasonable basis to rescind the job offer to Ms. Rhomes.  *Id.* at ¶¶ 4-6.

ORDER
PAGE - 13

### III.   DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party.  *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994).  However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 251.

**B.  Equal Protection, Free Speech, Emotional Distress**

As an initial matter, the Court dismisses Plaintiffs' equal protection, free speech and emotional distress claims.  *See* Dkt. #1, Ex. 1 at ¶ ¶ 4.5, 4.6 and 4.7.  Plaintiffs have failed to address these claims at all in their briefing.  *See* Dkt. #127.  In addition, it appears that their equal protection and free speech claims were brought only against William Kehoe, who has been voluntarily dismissed as a Defendant in this action.  Dkts. #1, Ex. 1 at ¶ ¶ 4.5 and 4.6 and

#32.  Further, as Defendant notes, Plaintiffs' emotional distress claim does not appear to be distinct from their discrimination and retaliation claims and therefore should be dismissed for that reason.  *Haubry v. Snow*, 106 Wn. App. 666, 678, 31 P.3d 1186 (Div. I 2001). Accordingly, the Court turns to Plaintiffs' remaining claims for discrimination, retaliation and hostile work environment under Washington's Law Against Discrimination ("WLAD").  Dkt. #1, Ex. 1 at ¶ ¶ 4.2, 4.3 and 4.4.

### C.  Discrimination/Hostile Work Environment

Washington's Law Against Discrimination ("WLAD") prohibits employers from discriminating against employees because of race or national origin (among other prohibited classifications).  RCW 49.60.180(3).  Prohibited discrimination includes harassment based on race which "unfairly handicaps an employee against whom it is directed in his or her work performance."  *See Francom v. Costco Wholesale Corp.*, 98 Wash. App. 845, 852-53, 991 P.2d 1182 (2000), *as amended on reconsideration* (Feb. 29, 2000)(*quoting Glasgow v. Georgia-Pacific Corp.*, 103 Wash.2d 401, 405, 693 P.2d 708 (1985).  In the context of employment discrimination, Washington courts have traditionally found federal case law persuasive. *Loeffelholz v. Univ. of Washington*, 175 Wash. 2d 264, 274 n.1, 285 P.3d 854 (2012).  To establish a *prima facie* hostile work environment claim, a plaintiff must show the following four elements: "(1) the harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer."  *Id.* at 275.  A plaintiff claiming that she suffered an adverse employment action because of her race can avoid summary judgment with either direct or circumstantial evidence that race was a substantial factor in that action.  *See Scrivener v. Clark College*, 181 Wn.2d 439, 334 P.3d 541, 545-46

ORDER
PAGE - 15

(Wash. 2014).  Direct evidence includes "discriminatory statements" and other evidence of discriminatory motive.  *Fulton v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 137, 279 P.3d 500, 507 n.17 (Wash. Ct. App. 2012).

While Plaintiffs have alleged separate claims for discrimination and hostile work environment under the WLAD, in opposition to Defendant's summary judgment motion they discuss their claim only in terms of hostile work environment.  *See* Dkt. #127 at 13-24.  Thus the Court analyzes the claim in the same terms.  For the reasons discussed herein, the Court now finds that Plaintiffs fail to produce any evidence, direct or circumstantial, that any of the adverse employment decisions of which they complain were motivated by racial animus, or that they were subjected to a racially hostile work environment.

It is first important to note that although Plaintiffs provide citations to the record in the "Statement of Facts" section of their opposition brief, they fail to cite to the record at all in their legal argument section.  *See* Dkt. #127 at 13-24.  The "party opposing summary judgment must direct [the court's] attention to specific, triable facts," *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003), and the reviewing court is "not required to comb through the record to find some reason to deny a motion for summary judgment," *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  In examining the "facts" asserted by Plaintiffs, the Court finds that Plaintiffs not only mischaracterize the evidence before the Court, they fail to direct the Court to specific, triable facts sufficient to defeat summary judgment.

Plaintiffs argue that Ms. Hobbs and Ms. Jackson create a triable issue of fact as to whether they were subject to a hostile work environment.[3]  Dkt. #127 at 15.  Specifically, they

---

[3]  Based on this argument, the Court understands Plaintiffs to be withdrawing or waiving any claim of hostile work environment with respect to Ms. Rhomes.  It is also undisputed that Ms.

argue that they were singled out from the rest of their Department based on their race, as evidenced by references to their group as "nigger row," "you guys," or "those people." *Id.* The record does not support this argument.

First, nearly all of the conduct on which this claim is based occurred prior to August 2010 when Mr. Kirouac was employed by KCIT. Indeed, with respect to the terms "you guys," Plaintiffs cite to one conversation between Ms. Jackson and Mr. Kirouac about providing good customer service behind a locked door. Dkt. #123, Ex. 2 at 44:7-45:23. Nothing about that conversation suggests racial animus. Further, the Court finds no evidence of any continuous reference to Ms. Hobbs and Ms. Jackson in a derogatory manner as "you people." Plaintiffs rely on an account by Ms. Rhomes wherein a "young man" apparently called the help desk and informed Ms. Rhomes that Ms. McCollum-Wallace had told him that a ticket had been "misissued by those people." Dkt. #123, Ex. 5 at 33:13-34:21. Ms. Rhomes apparently perceived that to mean "those blacks." *Id.* at 34:9-21. Without more, the Courts finds nothing in the record to support Plaintiffs' assertion that the comment was made with racial animus.

Plaintiffs' argument that even a single comment in the workplace can be sufficient to defeat summary judgment is also not persuasive. Plaintiffs rely on *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005) to support their assertion. Dkt. #127 at 15-16. However, in that case, the court of appeals noted that even though the comment at issue did not appear particularly severe, "there was unrefuted evidence" of the frequency and pervasiveness of the individual defendant's conduct and that he continued to utter the demeaning phrase on several occasions. *El-Hakem*, 415 F.3d at 1073. The case does not address situations where there was only a single uttered comment.

---

Rhomes did not work for King County after June 30, 2010, which places her complaints beyond the statute of limitations. Therefore, the Court dismisses any hostile work environment claim brought by Ms. Rhomes.

ORDER
PAGE - 17

The Court also finds a lack of evidence supporting the assertion that Plaintiffs were referenced in derogatory terms by others. Notably, Plaintiffs never heard the phrase "nigger row" or "minority row" themselves. More importantly, they fail to provide any testimony by anyone other than Ms. Jackson and Ms. Rhomes that they were ever told of the comments. In fact, even Ms. Hobbs' declaration in support of her opposition is devoid of any statement that she heard the comment from anyone. *See* Dkt. #114. Ms. Jackson identified two people who allegedly told her about the comment – Karl Banks and co-Plaintiff Gwen Rhomes. Dkt. #123, Ex. 2 at 57:16-20. There is nothing in the record from Mr. Banks himself regarding what he heard or did not hear, or what he may have told Ms. Jackson. Ms. Rhomes admits that she also did not hear the phrase directly but heard it from someone else. Dkt. #123, Ex. 5 at 28:6-17. Again, there is nothing in the record from anyone else regarding what he or she may have said to Ms. Rhomes.[4]

Plaintiffs rely on a Second Circuit case for the proposition that they need not be present to hear the racial slur in order to suffer from a hostile work environment. Dkt. #127 at 17. That case, *Schwapp v. Town of Avon*, 118 F.3d 106 (2nd Cir. 1997), is not persuasive in the circumstances of this case. In *Schwapp*, the court noted that the record contained evidence of eight comments made outside of the Plaintiff's presence, which were supported by third parties. *Schwapp*, 118 F.3d at 108. The court of appeals found that these comments presented issues of triable fact in light of the other evidence that Plaintiff has suffered from a pervasive and continuing pattern of conduct. *Id.*at 111. As further discussed herein, that is not the situation in this case.

---

[4] The Court does not suggest that these terms are not offensive. Rather, the Court concludes that evidence supporting the assertions made by Plaintiffs is lacking.

Likewise, the Court finds no supporting evidence in the record that Plaintiffs were referred to as "monkeys."  Ms. Rhomes asserts that Mr. Kirouac referred to them as "monkeys" in a group meeting.  Notably, Plaintiffs do not provide Declarations or other sworn testimony of any other individuals who heard this comment.  Moreover, Defendants concede that Mr. Kirouac did use the term, but in the context of discussing a book entitled "The One Minute Manager Meets the Monkey" by Ken Blanchard, in which the author calls workplace problems "monkeys."  Dkt. #134 at ¶ 3.  Others have testified that Mr. Kirouac used the term "monkey" only in the context of workplace problems.  Given Plaintiffs' failure to point to any other time in which Mr. Kirouac or any other King County employee used the term, the Court finds no triable issue of fact precluding summary judgment.

In addition, the Court finds that Ms. Hobbs has undermined her own claim of hostile work environment.  In her deposition in this matter she has denied that anyone at King County ever made a racially-offensive comment to her, or that anyone had made comments to her that she found offensive for any reason.  Dkt. #107, Ex. H at 91:15-20.  She also testified that she had "very limited" personal interactions with Mr. Kirouac.  *Id.* at 91:21-25.

The Court also finds inadequate evidence in the record to support Ms. Hobbs' claims that Mr. Mudrovich subjected her to racial hostility.  Ms. Hobbs argues that as the only African American working for Mr. Mudrovich, she was forced to perform remedial jobs like cleaning the supply room and moving boxes, and that he was overly critical of her work.[5]  Dkt. #127 at 15.  She also asserts that Mr. Mudrovich supported the reclassification of the jobs of her co-workers but not her, and that she is the only person he ever put on a performance improvement plan.  *Id.*  These allegations are refuted by the record.

---

[5]  Ms. Hobbs also makes the blanket assertion that "all" of her coworkers were Caucasian.  Dkt. #127 at 2.  That does not appear to be true.  Apparently, Ms. Hobbs worked for a diverse group including many Asian Americans.  Dkt. #131 at ¶ 4.

ORDER
PAGE - 19

First, the record demonstrates that Mr. Mudrovich imposed the performance improvement plan at the direction of his supervisor, Mr. Vida.  Dkt. #104 at ¶ 14.  Further, he addressed performance issues with other employees as well as with Ms. Hobbs.  *Id.* at ¶ 17.  Moreover, Mr. Mudrovich documented and supported the errors made by Ms. Hobbs.  *Id.* at ¶ ¶ 19-33 and exhibits thereto.  Ms. Hobbs provides no evidence to contradict those documented errors, nor has she provided any evidence that any other co-worker of hers was making the same mistakes but was not disciplined for it.  Second, Ms. Chou made the decision to reassign Ms. Hobbs to fiscal specialist work at Mr. Kehoe's direction, and it was Mr. Kehoe who made the decision to terminate Ms. Hobbs.  Dkts. #101 at ¶ ¶ 10-13 and #131 at ¶ 3.  Third, tasks such as cleaning the supply room and the kitchen were shared by everyone and every section.  Dkt. #131 at ¶ 9 and Ex. E thereto.  Finally, there is evidence that other Caucasian employees also did not receive requested reclassifications.  Dkt. #131 at ¶ 6 and Ex. C thereto.  It is also important to note that Mr. Mudrovich does not determine who is reclassified.  *Id.* at ¶ 5.

Finally, Plaintiffs have provided no evidence of any ongoing hostility within the applicable limitations period.  Plaintiffs do not dispute that their claims are subject to a three-year statute of limitations.  *Compare* Dkt. #91 at 14 *with* Dkt. #127 at 18.  The instant lawsuit was filed on June 26, 2014, in King County Superior Court.  Dkt. #1, Ex. A.  Including the claim filing statute that applies to Washington municipal entities (which extends the limitations period by 60 days), the limitations date is April 26, 2011.  Plaintiffs argue that the conduct occurring before that date should be considered as part of an ongoing violation.  Plaintiffs' argument fails because they have not provided adequate evidence of any hostile conduct occurring before April of 2011, and they have failed to demonstrate any related conduct after 2011.  Ms. Hobbs argues that Mr. Mudrovich subjected her to racial harassment starting in

2008 and continuing until 2013.  As discussed above, these allegations are not supported by the record.  Likewise, Plaintiffs provide no evidence that Ms. Jackson was subjected to conduct prior to April 2011 that continued beyond that date.

For all of these reasons, Plaintiffs have failed to demonstrate either a *prima facie* case of discrimination/hostile work environment or that Defendant did not have legitimate, non-discriminatory reasons for the various actions taken with respect to each Plaintiff.  In addition, even if Plaintiffs could demonstrate a *prima facie* case, they have failed to show any pretext. As a result, their discrimination/hostile work environment claims must be dismissed.

**D.  Retaliation**

Finally, the Court turns to Plaintiffs' retaliation claim.  To establish a *prima facie* case of retaliation under the WLAD, the employee must show that (1) she engaged in statutorily protected activity;  (2) the employer took some adverse employment action against the employee; and (3) there is a causal link between the protected activity and the adverse action. *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 374, 112 P.3d 522 (2005).  In this case, Ms. Jackson and Ms. Rhomes assert they suffered retaliation after complaining about their alleged racially hostile work environment.[6]  Dkt. #127 at 21.

With respect to Ms. Rhomes, Defendant does not dispute that she engaged in protected activity.  Dkt. #91 at 15.  However, Defendant argues that she has failed to provide any evidence of a causal link between her protected activity and King County's rescission of its job offer to her in 2013.  The Court agrees.  Ms. Rhomes points to no evidence in the record supporting even an inference of retaliation.  Dkt. #127 at 22.  In fact, the only allusion she makes to retaliation is her belief that Ms. Ynzunza had previously labeled her as a

---

[6]  Based on this argument, the Court understands Plaintiffs to be withdrawing or waiving any claim of retaliation with respect to Ms. Hobbs, and therefore dismisses any such claim.

"troublemaker." Dkt. #127 at 22. It is unclear whether she believes Ms. Ynzunza actually made the decision to rescind the offer, however, she states:

> Ms. Rhomes was offered the position when Ms. Ynzunza, who had previously labeled Ms. Rhomes as a "troublemaker," was out of the office. When Ms. Ynzunza returned to work and learned that Ms. Rhomes had been hired, she demanded that the offer be rescinded.

Dkt. #127 at 22-23. Without any citation to the record, Ms. Rhomes then states in conclusory manner that she "provide[s] sufficient details of the hostility and retaliatory documents to enable a trier of fact to conclude that retaliation occurred and that the County's asserted reason is pretext." Dkt. #127 at 24.

The record does not support Ms. Rhomes' assertions. First, it is undisputed that Ms. Ynzunza did not make the decision to rescind Ms. Rhomes' job offer. That decision was made by Mr. Kehoe. Dkts. #107, Ex. D at 114:4-115:5 and #109 at ¶ 27. Further, there is no evidence that his reasons for rescinding the offer were pretextual. Indeed, King County Ombudsman investigator Lynn Anders concluded that it was more likely than not that Ms. Rhomes had exhibited offensive or aggressive behavior when talking with Ms. Maley and Ms. Hanisco, and therefore those interactions were a reasonable basis to rescind the job offer to Ms. Rhomes. Dkt. #92 at ¶¶ 4-6. Ms. Rhomes provides no evidence to the contrary, and admits that she speaks "passionately." Dkt. #127 at 11. Accordingly, Ms. Rhomes fails to state a *prima facie* claim of retaliation.

With respect to Ms. Jackson, there is no evidence in the record to support her contention that she was not promoted to a lead customer service position because of her EEO complaint. Indeed, she was one of the finalists for the position, but was outscored by the person who ultimately received the job. Dkts. #93 at ¶ 7 and #109, Ex. 6. Ms. Jackson herself has admitted that she did not perform as well as she would have liked in her interview. Dkt. #99, Ex. 1 at

ORDER

75:22-76:12.  Further, Ms. McCollum-Wallace had been working in IT customer service and technical support since 1989 (22 years of experience at the time), and Ms. Jackson agrees that she was qualified to be the customer service lead.  Dkt. #99, Ex. 1 at 77:13-79:2.  Although Ms. Jackson continues to claim that she met resistance in getting the raw scores from the interview process, she does not deny that she ultimately received them or that they support that Ms. McCollum-Wallace was the highest scoring candidate.  Likewise, Ms. Jackson provides no evidence supporting her conclusory statement that she was "the most qualified candidate" other than by referencing she had over 15 years of experience.  Finally, Ms. Jackson points to the fact that Mr. Heath was on her first interview panel and suggests this is the reason she did not receive a promotion.[7]  Yet, she provides no evidence disputing that Mr. Heath actually co-ranked her in first place for the position.  Accordingly, Ms. Jackson also cannot make a *prima facie* case of retaliation.

For all of these reasons, the Court finds that Plaintiffs have failed to produce sufficient evidence of a causal link between their protected activities and any adverse employment action.  As a result, their retaliation claims must be dismissed.

## IV.    CONCLUSION

Having reviewed Defendant's motion, Plaintiffs' opposition thereto, and Defendant's Reply in support thereof, along with the accompanying Declarations and Exhibits and the remainder of the record, the Court hereby finds and ORDERS:

---

[7]    Ms. Jackson also appears to raise other allegations of retaliatory conduct by way of Declaration, such as a complaint that her pay decreased in 2015 based on a lower performance appraisal score.  Dkt. #115 at ¶ 6.  However, she does not discuss this issue at all in her opposition brief.  As noted above, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment," *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Accordingly, the Court will not further address the issue.

ORDER
PAGE - 23

1.  Defendant's Motion for Summary Judgment (Dkt. #91) is GRANTED and all of
    Plaintiffs' claims are dismissed in their entirety.

2.  This matter is now CLOSED.

DATED this 7th day of January 2016.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 24